**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------------------X

ANDREW HALLINAN,

                                              Plaintiff,         **COMPLAINT**

                    -against-

THE CITY OF NEW YORK; NYPD CAPTAIN KEVIN T.
RUSSELL; NYPD INSPECTOR ELIAS J. NIKAS; NYPD       **Case No.: 26-cv-04381**
OFFICER ARMIN SABOVIC; NYPD OFFICER BRIAN P.
SWEENEY;      NYPD      SERGEANT      BRIAN   **PLAINTIFF DEMANDS**
RAGHOENATHSINGH; NYPD DETECTIVE MICHAEL J.   **A TRIAL BY JURY**
LOMBARDI; NYPD OFFICER DENNIS PENG; NYPD
OFFICER ERIC. J. RODRIGUEZ; NYPD OFFICER HOWARD
J. THORNTON; AND NYPD MEMBERS JOHN AND JANE
DOE 1-10;

                                            Defendants.

--------------------------------------------------------------------------------X

       Plaintiff ANDREW HALLINAN, by and through his attorneys, COHEN&GREEN P.L.L.C., WYLIE STECKLOW P.L.L.C., and GIDEON ORION OLIVER hereby complains of Defendants as follows:

## PARTIES

       1.     At all times mentioned herein, Plaintiff ANDREW HALLINAN (Mr. Hallinan; he/him), was a resident of Kings County in the City and State of New York.

       2.     At all relevant times mentioned herein, Defendant City of New York was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the New York City Police Department ("NYPD"), and their employees.

       3.  Defendants related to the May 25, 2023 incident:

1

a. Captain Kevin T. Russell (NYPD Tax Registration No. 945302) was, at all times relevant to this Complaint, a member of the NYPD. Captain Russell is currently assigned to the 123rd Precinct.

b. Inspector Elias J. Nikas (NYPD Tax Registration No. 902105) was, at all times relevant to this Complaint, a member of the NYPD, although he is not currently an active member of service. Upon information and belief, Inspector Nikas retired from the NYPD. The source of this knowledge being the CCRB investigation for this incident that resulted with "Miscellaneous – Subject Retired" as well as an email confirmation from the NYPD Employee Verification Unit, received by Plaintiff's counsel on May 26, 2026.

c. Officer Armin Sabovic (Shield No. 6136; NYPD Tax Registration No. 970831) was, at all times relevant to this Complaint, a member of the NYPD. Officer Sabovic is currently assigned to the 13th Precinct.

d. Former Officer Brian P. Sweeney (Shield No. 23366; NYPD Tax Registration No. 970248) was, at all times relevant to this Complaint, a member of the NYPD, although he is not currently an active member of service. Former Officer Sweeney's last command assignment was the 13th Precinct.

e. Sergeant Brian Raghoenathsingh (Shield No. 4271; NYPD Tax Registration No. 956185) was, at all times relevant to this Complaint, a member of the NYPD. Sergeant Raghoenathsingh is currently assigned to the 13th Precinct.

4. Defendants related to the August 27, 2023 incident:

2

a. Defendant NYPD Member Doe 1 was, at all times relevant to this Complaint, a member of the NYPD, in uniform, working in his official capacity. Plaintiff does not currently know the true name of Defendant Doe 1, but upon information and belief, his name is known to the defendants.

b. Detective Michael J. Lombardi (Shield No. 5048; NYPD Tax Registration No. 936970) was, at all times relevant to this Complaint, a member of the NYPD. Upon information and belief, Detective Lombardi retired in 2025.

c. Officer Dennis Peng (Shield No. 20134; NYPD Tax Registration No. 962674) was, at all times relevant to this Complaint, a member of the NYPD. Officer Peng is currently assigned to Strategic Response Group 4.

5. Defendants related to the January 26, 2024 incident:

a. Officer Eric J. Rodriguez (Shield No. 6358; NYPD Tax Registration No. 952174) was, at all times relevant to this Complaint, a member of the NYPD. Officer Rodriguez is currently assigned to Police Academy Payroll and Roll Call.

b. Defendants NYPD Member Does 2-4 were at all times relevant to this complaint members of the NYPD, in uniform, working in their official capacities. Plaintiff does not currently know the true names of the Doe Defendants, but upon information and belief, their names are known to the defendants.

6. Defendants related to the February 22, 2024 incident:

3

    a. Officer Howard J. Thornton (Shield No. 14002; NYPD Tax Registration No. 961369) was, at all times relevant to this Complaint, a member of the NYPD. Officer Thornton is currently assigned to Strategic Response Group 1.

    b. Defendants NYPD Member Does 5-7 were at all times relevant to this complaint members of the NYPD, in uniform, working in their official capacities. Plaintiff does not currently know the true names of the Doe Defendants, but upon information and belief, their names are known to the defendants.

7. Defendants related to the March 23, 2024 incident:

    a. Defendants NYPD Member Does 8-10 were at all times relevant to this complaint members of the NYPD, in uniform, working in their official capacities. Plaintiff does not currently know the true names of the Doe Defendants, but upon information and belief, their names are known to the defendants.

8. At all times relevant herein, the Defendants were employed by the City of New York as members of the NYPD.

9. The individual Defendants are sued herein in their official and individual capacities.

10. At all times hereinafter mentioned, the Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

11. Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

12.     The Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

13.     The Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

14.     At all times relevant herein, as set forth more fully below, the Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

15.     Although they were aware of the conduct, present for it, and knew or should have known it was unconstitutional, at no point did any of the Defendants, or any other member of the NYPD, take any steps to intervene in, prevent, or otherwise limit the unconstitutional conduct engaged in by their fellow officers.

## JURISDICTION AND VENUE

16.     Plaintiff brings this action pursuant to 42 U.S.C. § 1983, the First, Fourth, and Fourteenth Amendments to the United States Constitution, and the New York City Administrative Code.

17.     This Court has jurisdiction over the claims herein pursuant to 28 U.S.C. §§ 1331, 1343, and 1367, and 42 U.S.C. § 1983.

18.     This action has been initiated within three years of the accrual of Plaintiff's claims.[1]

19.     Venue is proper in the County of New York, as it is where Defendant City of New York has offices and a majority of the actions complained of herein occurred.

## STATEMENT OF FACTS

### MR. HALLINAN'S EXPERIENCE ON MAY 25. 2023

20.     On May 25, 2023, at or around 8:00 p.m., Plaintiff was present at or around Union Square East in Manhattan.

21.     Plaintiff was there to document a demonstration against police brutality held on the 3-year anniversary of George Floyd's murder.

22.     Plaintiff is a photographer and attended the protest to photograph NYPD members, as he had been doing weekly leading up to this date. Plaintiff's photography requires the use of a flash, as it is integral to his ability to document these protests and clearly capture the details he aims to showcase in his work.

23.     Prior to the march beginning, Plaintiff took photos of multiple officers at Union Square, including Defendant Nikas.

24.     At some point, Defendant Nikas beckoned several NYPD TARU officers towards Plaintiff. These officers gathered around Plaintiff and activated their body-worn cameras at Defendant Nikas's instruction.

25.     After several seconds passed, Defendant Nikas said to Plaintiff, "If you flash that in our eyes tonight, on the camera, I'm letting you know you're going to be placed under arrest […] That's your warning."

---

[1] The three-year statute of limitations for the May 25, 2023, incident expired on May 25, 2026. May 25, 2026, was Memorial Day, which is a legal holiday. Therefore, under Fed. R. Civ. P. 6(a)(1)(C), the statute of limitations did not expire on May 25, but would extend until the following day, on May 26, 2026.

26.     Plaintiff marched uptown with the protest toward Bryant Park.

27.     When they reached 3 Bryant Park, around 9:30 p.m., Plaintiff took a photo of NYPD members, including Defendant Russell, and his camera emitted a flash.

28.     Plaintiff taking the photograph nor his use of flash interfered with any NYPD members' activities. He did not flash the light in anyone's eyes.

29.     Nevertheless, Defendant Russell approached Plaintiff and pushed Plaintiff's arm before grabbing Plaintiff by his shoulders.

30.     Defendant Russell pushed Plaintiff backwards while Defendant Sweeney and Defendant Sabovic moved forward to assist and grab hold of Plaintiff.

31.     Defendant Russell then aggressively pulled Plaintiff towards him before forcefully taking Plaintiff down, with Defendant Sabovic's help.

32.     While Plaintiff was on the ground, several NYPD members, including Defendants Russell, Sweeney, Sabovic, and/or Raghoenathsingh, used the weight of their bodies to put unnecessary pressure down on Plaintiff's back as they held him to the ground.

33.     Defendants Russell, Sweeney, and Sabovic put handcuffs on Plaintiff's wrists and arrested him.

34.     Plaintiff was not engaged in any violent or threatening behavior and there was no reason for Defendants to use any level of force on Plaintiff, much less the level of force actually employed.

35.     Defendants then placed Plaintiff in an NYPD transport vehicle and transported him to One Police Plaza.

36.     Rather than issuing Plaintiff a summons or other legal process on the street, NYPD members took Plaintiff to a centralized arrest processing location.

37.     Because NYPD members arrested Plaintiff in connection with a protest, they subjected Plaintiff to unreasonable and lengthy NYPD large-scale arrest processing, to which other similarly situated people detained by the NYPD for the same offense(s) with which Plaintiff was charged outside of the protest context are not subjected.

38.     As a result, that arrest processing unjustifiably and unreasonably lengthened Plaintiff's detention; curtailed and prevented Plaintiff from exercising Plaintiff's rights to speech, association, and assembly, and to petition the government; cast a chill on Plaintiff's desire to participate in such protected expression in the future; and otherwise, injured and damaged Plaintiff.

39.     Plaintiff was in custody until approximately 1:20 a.m., on May 26, 2023.

40.     Defendant Sabovic issued Plaintiff a Desk Appearance Ticket ("DAT") charging Plaintiff with a violation of NYPL §195.05, obstructing governmental administration.

41.     On May 30, 2023, the charges were ultimately dismissed in Plaintiff's favor when the New York County District Attorney's Office declined to prosecute.

42.     The Defendants' conduct directly and proximately caused physical and emotional injury to Plaintiff.

43.     The Defendant's conduct unlawfully interfered with Plaintiff's rights under the First Amendment.

## MR. HALLINAN'S EXPERIENCE ON AUGUST 27, 2023

44.     On August 27, 2023, at or around 12:30 p.m., Plaintiff was present to document a counter-protest organized in response to the anti-migrant "We Are The People Freedom Rally" outside Gracie Mansion, at or around East 88th Street and East End Avenue in Manhattan.

45.     Upon information and belief, no dispersal order had been issued.

8

46.    Defendant Doe 1, who may be the same person as Defendant Lombardi, grabbed Plaintiff and forcefully slammed him down to the ground.

47.    Plaintiff was not engaged in any violent or threatening behavior and there was no reason for Defendants to use this level of force.

48.    Defendant Lombardi then placed Plaintiff in excessively tight handcuffs before loading him into an NYPD transport vehicle.

49.    Rather than issuing Plaintiff a summons or other legal process on the street, NYPD members took Plaintiff to a centralized arrest processing location.

50.    Because NYPD members arrested Plaintiff in connection with a protest, they subjected Plaintiff to unreasonable and lengthy NYPD large-scale arrest processing, to which other similarly situated people detained by the NYPD for the same offense(s) with which Plaintiff was charged outside of the protest context are not subjected.

51.    As a result, that arrest processing unjustifiably and unreasonably lengthened Plaintiff's detention; curtailed and prevented Plaintiff from exercising Plaintiff's rights to speech, association, and assembly, and to petition the government; cast a chill on Plaintiff's desire to participate in such protected expression in the future; and otherwise, injured and damaged Plaintiff.

52.    Defendants, including Peng, created official criminal court paperwork relying on fabricated evidence, including about purported observations of Plaintiff's alleged pre-arrest conduct, created official NYPD paperwork based upon said fabricated evidence and/or forwarded such fabricated evidence to prosecutors and/or initiated charges against Plaintiff, relying on fabricated evidence and without probable cause.

53.    Specifically, Defendant Peng swore out a criminal complaint charging Plaintiff, which bears the docket number CR-024613-23NY.

54.     In the criminal complaint, Defendant Peng stated that Defendant Lombardi informed Defendant Peng that he observed Plaintiff, with intent to prevent a police officer from performing a lawful duty, cause physical injury to such police officer; that he observed Plaintiff, with intent to cause physical injury to another person, cause such injury to such person or to a third person; that he observed Plaintiff recklessly cause physical injury to another person; that he observed Plaintiff, with intent to cause physical injury to another person, attempt to cause such injury to such person or to a third person; and that he observed Plaintiff, with intent to cause public inconvenience, annoyance and alarm, engage in fighting and in violent, tumultuous and threatening behavior.

55.     These allegations were false and Defendant Lombardi knew them to be false when he made them.

56.     After some hours passed, Plaintiff was transferred to Central Booking.

57.     Plaintiff was in custody at Central Booking until the following day when he was brought before a judge for arraignment before finally being released from custody.

58.     Despite the false nature of Defendant Lombardi's allegations, Defendant Peng swore out the Criminal Complaint and forwarded it to the New York County District Attorney's office.

59.     Plaintiff was prosecuted pursuant to these false allegations for several months before the charges against him were dismissed on grounds consistent with his innocence.

60.     On October 2, 2023, Plaintiff's charges were all dismissed, for insufficient evidence.

61.     The Defendants' conduct directly and proximately caused physical and emotional injury to Plaintiff.

10

62.  The Defendant's conduct unlawfully interfered with Plaintiff's rights under the First Amendment.

## MR. HALLINAN'S EXPERIENCE ON JANUARY 26, 2024

63.  On January 26, 2024, at or around 3:00 p.m. – 4:00 p.m., Plaintiff was present at or around Madison Avenue between 49th Street and 50th Street in Manhattan.

64.  Plaintiff was there to document a demonstration against the genocide in Palestine.

65.  Plaintiff attended the protest to photograph NYPD members and document the action. As explained above, Plaintiff's photography requires the use of a flash.

66.  After some time passed, the rally turned into a march and began to move. Plaintiff went with the group.

67.  Upon information and belief, no dispersal order had been issued.

68.  At or around 44th Street and Lexington Avenue, at least 3 NYPD members, Defendant Does 2-4, pushed Plaintiff into the intersection.

69.  The Defendant Does pushed Plaintiff so that he fell to the ground, which caused the middle finger on his left hand to become dislocated.

70.  Plaintiff was in severe pain and popped his dislocated finger back into place.

71.  Plaintiff was not engaged in any violent or threatening behavior and there was no reason for Defendants to use any level of force on Plaintiff, much less the level of force actually employed.

72.  Defendants then placed Plaintiff in an NYPD transport vehicle and transported him to One Police Plaza.

73.  Rather than issuing Plaintiff a summons or other legal process on the street, NYPD members took Plaintiff to a centralized arrest processing location.

11

74. Because NYPD members arrested Plaintiff in connection with a protest, they subjected Plaintiff to unreasonable and lengthy NYPD large-scale arrest processing, to which other similarly situated people detained by the NYPD for the same offense(s) with which Plaintiff was charged outside of the protest context are not subjected.

75. As a result, that arrest processing unjustifiably and unreasonably lengthened Plaintiff's detention; curtailed and prevented Plaintiff from exercising Plaintiff's rights to speech, association, and assembly, and to petition the government; cast a chill on Plaintiff's desire to participate in such protected expression in the future; and otherwise, injured and damaged Plaintiff.

76. Plaintiff was held in custody until approximately 9:25 p.m.

77. Defendant Rodriguez issued Plaintiff a Desk Appearance Ticket charging Plaintiff with a violation of NYPL §195.05, obstructing governmental administration. Defendant Rodriguez is listed as Plaintiff's Arresting Officer on the DAT.

78. On February 9, 2024, the charges were ultimately dismissed in Plaintiff's favor when the New York County District Attorney's Office declined to prosecute.

79. The Defendants' conduct directly and proximately caused physical and emotional injury to Plaintiff.

80. The Defendant's conduct unlawfully interfered with Plaintiff's rights under the First Amendment.

### MR. HALLINAN'S EXPERIENCE ON FEBRUARY 22, 2024

81. On February 22, 2024, at or around 7:00 p.m., Plaintiff was present at or around 117 MacDougal St, New York, NY 10012 in Manhattan, outside the Comedy Cellar.

82. Plaintiff was there to document a demonstration protesting the genocide in Palestine.

83.     Plaintiff attended the protest to photograph NYPD members and document the action. As explained above, Plaintiff's photography requires the use of a flash.

84.     Upon information and belief, no dispersal order had been issued.

85.     3 NYPD members, Defendant Does 5-7, grabbed Plaintiff and pulled Plaintiff's hood over his face so he could not see.

86.     Plaintiff felt something hit his face around his mouth area. It felt like a fist and he had blood in his mouth.

87.     Does 5-7 then forced Plaintiff up against a door and held him there while pushing Plaintiff's face into the metal.

88.     Plaintiff felt something hit his face around his mouth area. It felt like a fist and he had blood in his mouth.

89.     Plaintiff was not engaged in any violent or threatening behavior and there was no reason for Defendants to use any level of force on Plaintiff, much less the level of force actually employed.

90.     Rather than issuing Plaintiff a summons or other legal process on the street, Defendants then placed Plaintiff in an NYPD transport vehicle and transported him to a centralized arrest processing location.

91.     Because NYPD members arrested Plaintiff in connection with a protest, they subjected Plaintiff to unreasonable and lengthy NYPD large-scale arrest processing, to which other similarly situated people detained by the NYPD for the same offense(s) with which Plaintiff was charged outside of the protest context are not subjected.

92.     As a result, that arrest processing unjustifiably and unreasonably lengthened Plaintiff's detention; curtailed and prevented Plaintiff from exercising Plaintiff's rights to speech,

association, and assembly, and to petition the government; cast a chill on Plaintiff's desire to participate in such protected expression in the future; and otherwise, injured and damaged Plaintiff.

93.     Plaintiff was held in custody until approximately 10:11 p.m.

94.     Defendant Thornton issued Plaintiff a Desk Appearance Ticket charging Plaintiff with a violation of NYPL §205.30, resisting arrest. Defendant Thornton is listed as Plaintiff's Arresting Officer on the DAT.

95.     On March 11, 2024, the charges were ultimately dismissed in Plaintiff's favor when the New York County District Attorney's Office declined to prosecute.

96.     NYPD members improperly vouchered Plaintiff's property listing the category as "forfeiture" instead of using the correct category of "arrest evidence." Upon information and belief, this mis-categorization is, in part, what made it an especially difficult and lengthy process for the NYPD to release Plaintiff's property back to him.

97.     The Defendants' conduct directly and proximately caused physical and emotional injury to Plaintiff.

98.     The Defendant's conduct unlawfully interfered with Plaintiff's rights under the First Amendment.

### MR. HALLINAN'S EXPERIENCE ON MARCH 23, 2024

99.     On March 23, 2024, sometime in the afternoon, Plaintiff participated in a counter-protest in response to the "International Gift of Life Walk", at or around Broadway and Stone Street in Manhattan.

100.    Upon information and belief, no dispersal order had been issued.

101.    Defendant Doe 8 grabbed violently Plaintiff and forcefully pushed him several feet backwards.

102.    Defendant Doe 9 quickly approached and also grabbed Plaintiff, assisting Doe 8 in throwing Plaintiff down to the ground.

103.    Defendant Doe 10 then ran over, and assisted Doe 8 in handcuffing Plaintiff.

104.    Rather than issuing Plaintiff a summons or other legal process on the street, NYPD members took Plaintiff to a centralized arrest processing location.

105.    Because NYPD members arrested Plaintiff in connection with a protest, they subjected Plaintiff to unreasonable and lengthy NYPD large-scale arrest processing, to which other similarly situated people detained by the NYPD for the same offense(s) with which Plaintiff was charged outside of the protest context are not subjected.

106.    As a result, that arrest processing unjustifiably and unreasonably lengthened Plaintiff's detention; curtailed and prevented Plaintiff from exercising Plaintiff's rights to speech, association, and assembly, and to petition the government; cast a chill on Plaintiff's desire to participate in such protected expression in the future; and otherwise, injured and damaged Plaintiff.

107.    Defendants created official criminal court paperwork relying on fabricated evidence, including about purported observations of Plaintiff's alleged pre-arrest conduct, created official NYPD paperwork based upon said fabricated evidence and/or forwarded such fabricated evidence to prosecutors and/or initiated charges against Plaintiff, relying on fabricated evidence and without probable cause.

108.    The criminal complaint charging Plaintiff bears the docket number CR-008511-24NY and states that an NYPD member observed Plaintiff, with intent to prevent a police officer from performing a lawful duty, cause physical injury to such police officer.

109. These allegations were false and the NYPD member swearing out the criminal complaint knew them to be false when he made them. Nonetheless, the criminal complaint was forwarded to the New York County District Attorney's office.

110. After some hours passed, Plaintiff was transferred to Central Booking.

111. Plaintiff was in custody at Central Booking until the following day when he was brought before a judge for arraignment before finally being released from custody.

112. On April 29, 2024, Plaintiff's charges were all dismissed when he took a plea for disorderly conduct.

113. The Defendants' conduct directly and proximately caused physical and emotional injury to Plaintiff.

114. The Defendant's conduct unlawfully interfered with Plaintiff's rights under the First Amendment.

**OTHER DOCUMENTS AND FACTS PLAINTIFF INCORPORATES BY REFERENCE**

115. Plaintiff incorporates by reference the facts contained in the reports that have been issued concerning Defendants' responses to the summer 2020 protests, including, *inter alia,* the report issued by the New York City Corporation Counsel and the report issued by the New York City Department of Investigation.[2]

116. Plaintiff incorporates by reference the factual allegations in other federal civil rights complaints in cases in the United States District Court for the Southern District of New

---

[2] Margaret Garnett, Commissioner, New York City Department of Investigation*, Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf; New York City Law Department, *Corporation Counsel Report Pursuant to Executive Order 58 (June 20, 2020) Directing an Analysis of Factors Impacting the George Floyd Protests in New York City* (Dec. 2020) ("OCC Report"), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.

York arising from Defendants' responses to the summer 2020 protests, that have since settled or are ongoing, including:

a. *Sow, et al. v. City of New York, et al.,* 20-cv-00533(CM)(GWG);

b. *People of the State of New York v. City Of New York, et al.*, 21-cv-322 (CM)(GWG);

c. *Payne, et al. v. De Blasio, et al.*, 20-cv-8924 (CM)(GWG);

d. *Sierra, et al. v. City of New York, et al.*, 20-cv-10291 (CM)(GWG);

e. *Wood v. De Blasio, et al.*, 20-cv-10541 (CM)(GWG);

f. *Yates v. City of New York, et al.,* 21-cv-01904 (CM)(GWG);

g. *Campbell v. City of New York,* 21-cv-04056 (AJN);

h. *Gray, et al., v. City of New York, et al.,* 21-cv-06610 (CM)(GWG); and

i. *Rolon, et al., v. City of New York, et al.,* 21-cv-2584 (CMG)(GWG).

## THE NYPD'S PERMISSIVE RESPONSE TO PRO-POLICE AND OTHER, SIMILAR DEMONSTRATIONS

117. The NYPD's violent response to the protests that Plaintiff participated in was dramatically different from their response to other kinds of protests and rallies.

118. On July 11, 2020, pro-police demonstrators held a "Rally to Back the Blue" in Dyker Heights, Brooklyn. Pro-police marchers yelled at and antagonized counter-protestors, making racist and sexist statements, grabbing them, and spitting in counter protestors' faces. The NYPD made no arrests at the rally.[3]

119. On July 13, 2020, pro-police "Blue Lives Matter" groups held a march in Bay Ridge, Brooklyn. The march was attended by counter protestors organized against police brutality.

---

[3] Sydney Pereira, *Videos Show Pro-Police demonstrators in Brooklyn Unleashing Racist, Sexist Vitriol Against Counter-Protestors*, Gothamist, July 12, 2020, available at https://gothamist.com/news/police-rally-back-the-blue-brooklyn-dyker-heights.

17

Though members of the pro-police group shouted racist and homophobic slurs at the counter protesters and assaulted them in view of NYPD officers, only two people were arrested – both Black men protesting police brutality. By contrast, a Blue Lives Matter demonstrator who punched a woman in the face in view of NYPD officers was not arrested.[4]

120.    In October 2020, hundreds of members of the ultra-Orthodox Jewish community in Brooklyn gathered in Borough Park to protest coronavirus restrictions imposed by Governor Cuomo. The protestors set fires in the street and threw masks into the flames. They chased away NYC Sheriff's Deputies and attacked a photojournalist reporting on the protest. An ultra-Orthodox Jewish man who opposed the protestors was attacked by protestors and beaten with rocks. Police said that no arrests or summons were issued to the protestors on the night of the rally.[5]

121.    On October 25, 2020, a group called Jews For Trump convoyed hundreds of cars draped with American flags and Trump 2020 banners. The caravan traveled from Coney Island to the Trump Tower in Manhattan before heading to a rally in a Brooklyn park. Despite engaging in acts of disorder during this caravan, this rolling group of pro-Trump agitators was allowed to continue unhindered by the NYPD.[6]

122.    On November 1, 2020, a coalition of Trump supporters in a vehicle caravan were escorted through New York City despite blocking numerous bridges and committing acts of

---

[4] Jake Offenhartz and Gwynne Hogan, *"They Defend Their Own Side": NYPD Accused of Protecting Blue Lives Matter Marchers in Bay Ridge*, Gothamist, July 13, 2020, available at https://gothamist.com/news/nypd-accused-protecting-violent-blue-lives-matter-marchers-bay-ridge.

[5] Jake Offenhartz, *Orthodox Borough Park Residents Burn Masks, Beat Dissenters Over COVID Lockdown*, Gothamist, Oct. 7, 2020, available at https://gothamist.com/news/orthodox-borough-park-residents-burn-masks-beat-dissenters-over-covid-lockdown.

[6] AP, *JEWS FOR TRUMP CAR PARADE STIRS PROTESTS, FIGHTS ACROSS NYC*, OCT. 26, 2020, AVAILABLE AT HTTPS://ABC7NY.COM/JEWS-FOR-TRUMP-TIMES-SQUARE-PROTEST-TODAY-IN-RIOT/7343862/

violence. One bystander attempted to photograph an obscured license plate of a vehicle in the caravan, but the driver of the vehicle drove into her, and police threw her to the ground.[7]

123.    On December 2, 2020, hundreds gathered in Staten Island to demand the reopening of a bar that was closed for violating the heath regulations related to COVID-19. Protestors blocked traffic and hundreds gathered on the streets and sidewalks. Though NYPD deputies were stationed outside the bar, it was reported that no arrests or summons were issued.[8,9]

124.    The NYPD has a history of treating even right-wing extremists more permissively. This pattern can be observed from the 1990s to the present.  By way of non-exhaustive example:

   a. In the early 1990s the NYPD stood by and took no action when a group of skinheads attacked a group of peaceful demonstrators. *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993).

   b. In 1992, the Patrolmen's Benevolent Association, egged on by mayoral candidate Rudy Giuliani, held a demonstration at City Hall Park in response to Mayor Dinkins's call for a Civilian Complaint Review Board. This led to one of the biggest riots in New York City history. On-duty police officers who were present did little to stop it, and even encouraged it, despite the fact that the off-duty rioting officers blocked the Brooklyn Bridge, stormed City Hall, committed acts of vandalism, and assaulted bystanders.[10,11]

   c. More recently, the NYPD has turned a blind eye to violence committed by the Proud Boys and other neo-Nazi groups. In one such instance in October of 2018, a mob of uniformed Proud Boys and right-wing skinheads cried homophobic slurs and kicked and stomped a person laying on the sidewalk. NYPD officers observed

---

[7] Jake Offenhartz, *Photos: Police Stand By As Caravans Of Trump Supporters Block Bridges, Gothamist*, Nov. 2, 2020, Threaten Counter-Protesters, available at https://gothamist.com/news/photos-police-stand-caravan-trump-supporters-block-bridges-threaten-counter-protesters

[8] Wilson Wong, *Hundreds protest closing of Staten Island bar that refused Covid-19 measures*, NBC NEWS, Dec. 3, 2020, available at https://www.nbcnews.com/news/us-news/hundreds-protest-closing-staten-island-bar-refused-covid-19-measures-n1249873.

[9] NBC News 4, *Staten Island Bar Reopens, Defying City and State COVID Orders Once Again*, December 5, 2020, available at https://www.nbcnewyork.com/news/coronavirus/staten-island-bar-reopens-defying-city-and-state-covid-orders-once-again/2762850/

[10] Nat Hentoff and Nick Hentoff, *Rudy's Racist Rants: An NYPD History Lesson*, Cato.org, July 14, 2016, available at https://www.cato.org/commentary/rudys-racist-rants-nypd-history-lesson

[11] Pamela Oliver, *When the NYPD Rioted*, University of Wisconsin – Madison, July 18, 2020, available at https://www.ssc.wisc.edu/soc/racepoliticsjustice/2020/07/18/when-the-nypd-rioted/

the violence but did not intervene to stop it. Instead, the NYPD was more concerned with controlling left-wing activists.[12] During this incident three left wing activists were arrested but not a single Proud Boy was questioned or arrested. Proud Boy leader Gavin McInnes boasted about the incident that the group had support from "[t]ons of cops, I have a lot of support in the NYPD…"[13]

### THE NYPD'S HISTORY OF MISHANDLING CERTAIN PROTESTS

125.    The extensive deprivations of constitutional rights suffered by Plaintiff here are part of the NYPD's long history of aggressive and unconstitutional policing of certain First Amendment-protected activities going back many years, including, *inter alia*, protests denouncing the murder of Amadou Diallo in 1999, as well as protests against the World Economic Forum (the "WEF") in 2002, the Iraq War in 2003, the Republican National Convention ("RNC") in 2004, the Occupy Wall Street ("OWS") protests in 2011 and 2012, and many other protests since, including Black Lives Matter and anti-police brutality protests.

126.    The NYPD response to the protests described herein was in line with its history of violent and unconstitutional responses to past protests challenging police conduct in New York City, including its treatment of certain First Amendment assemblies with demoralizing and brutal shows of force, rather than genuine efforts to facilitate protesters' protected First Amendment activity.

127.    For example, the NYPD met protests following the start of the Iraq War in 2003 with mass arrests, excessive force, and use of pepper spray.[14]

---

[12] JAKE OFFENHARTZ, *NYPD ACCUSED OF 'INCREDIBLY DEFERENTIAL TREATMENT' OF PROUD BOYS FOLLOWING BEATINGS CAUGHT ON VIDEO*, AVAILABLE AT, HTTPS://GOTHAMIST.COM/NEWS/NYPD-ACCUSED-OF-INCREDIBLY-DEFERENTIAL-TREATMENT-OF-PROUD-BOYS-FOLLOWING-BEATINGS-CAUGHT-ON-VIDEO

[13] Jake Offenhartz, *Proud Boys Leader: 'I Have A Lot Of Support In The NYPD'*, Gothamist, Oct. 15, 2018, https://gothamist.com/news/proud-boys-leader-i-have-a-lot-of-support-in-the-nypd

[14] *See,* e.g., N.Y. Civil Liberties Union, Arresting Protest (2003), available at https://www.nyclu.org/sites/default/files/nyclu_arresting_protest.pdf.

128.    The next year, during the police "Operation Overlord II" operation in response to the Republican National Convention in 2004, NYPD members treated protestors to similar uses of excessive force and mass arrests, and excessive and unreasonable detention.[15]

129.    The NYPD continued to employ similar mass arrest and excessive force tactics during a years-long crackdown on Critical Mass bicycle rides beginning in 2004.[16]

130.    Similarly, during the Occupy Wall Street ("OWS") protests in 2011, the NYPD used excessive force against protestors, bystanders, and National Lawyers Guild – New York City Chapter Legal Observers.[17]

131.    Additionally, Defendants have employed the same tactics and practices against Black Lives Matter, police accountability, and other, similar protests, over the intervening years.

132.    Following NYPD conduct during these and other protests, the City of New York and the NYPD and its members have been sued repeatedly by protestors who alleged that they had been unlawfully detained, kettled, arrested, subjected to mass arrest, unreasonable and prolonger detentions and violations of their First Amendment and other, related rights, much in the same manner as has the Plaintiff in this case.

133.    In many of these cases Defendants employed tactics developed and modified over the course of many years by former Commissioner Shea, former Chief Monahan, and their predecessors and by other defendant City policymakers at and in connection with other demonstrations in the City dating back to around 2000 and continuing through the present, including the policies, practices, and customs complained of herein, and also described and litigated in the following cases:

---

[15] *See,* e.g., N.Y. Civil Liberties Union, Rights and Wrongs at the RNC (2005), available at https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf.
[16] *See,* e.g., *Callaghan v. City of New York*, 07 Civ. 9611 (PKC)(JLC) (S.D.N.Y.).
[17] *See People of the State of New York v. City of New York et al.*, 21-cv-0322, Dkt. No. 1 at ¶ 26 (S.D.N.Y.).

a. *Burley v. City of New York*, 03-cv-2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) (class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia*, (1) NYPD policy of detaining perceived protesters who were otherwise eligible to be released earlier with DATs for excessive periods of time and denying them consideration for DAT release on the grounds of their perceived participation in protests and (2) policy and practice of using plastic flex cuffs as unreasonable and excessive because of the manner in which the handcuffs were applied and the length of time for plaintiffs were handcuffed);

b. *Allen v. City of New York,* 466 F. Supp. 2d 545, 546 (S.D.N.Y. 2006) (challenging mass arrests made in February 2002 related to the WEF alleging, *inter alia*, that the protestors remained on the sidewalk, walking two abreast and followed all rules of protesting, yet Executive Officers arrested them and "the police deliberately held [protesters] in custody for an unnecessarily long period of time in order to delay their arraignment in Criminal Court";

c. *Haus v. City of New York*, 03-cv-4915 (RWS)(MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests, alleging that arrests were made without probable cause and pursuant to Department directive to "engage in pre-emptive mass arrests and to subject arrestees to delayed and arduous post-arrest processing." See also *Larsen v. City of New York, et al.*, 04-cv-0665 (RWS) (S.D.N.Y.);

d. *Kunstler v. City of New York*, 04-cv-1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, raising *Monell* and other claims similar and related to the policies and practices complained of herein such as using extremely tight plastic handcuffs in their arrest;

e. *MacNamara v. City of New York*, 04-cv-9216 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Class Action Complaint, Dkt. No. 200-2), *Abdell. v. City of New York*, 05-cv-8453 (RJS)(JCF) (S.D.N.Y.), *Schiller. v. City of New York*, 04-cv-7922 (RJS) (JCF) (S.D.N.Y.), *Dinler v. City of New York*, 04-cv-7921 (RJS)(JCS) (S.D.N.Y.), *Kyne v. Wolfowitz,* 06-cv-2041 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Complaint, Dkt. No. 18), and the dozens of other cases consolidated for discovery purposes in the S.D.N.Y. arising from arrests made, and policies related to, the RNC in New York City in 2004. *See, e.g., Schiller*, No. 04-cv-7922 (RJS)(JCF), 2008 WL 200021 at *2-5 (S.D.N.Y. Jan. 23, 2008) (noting the City's consent to amendment of complaints in RNC cases to add, *inter alia*, "constitutional challenges to the defendants' alleged practice of detaining . . . all persons in connection with the RNC . . . no matter how minor the infraction, rather than issuing summonses on the street"); *MacNamara v. City of New York,* 275 F.R.D. 125, 154 (S.D.N.Y. 2011) (certifying six "mass arrest subclasses" as well as an "Excessive Detention Class" comprised of all RNC

arrestees who were processed pursuant to the RNC Mass Arrest Processing Plan and a "Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs[.]"); *Dinler*, No. 04-cv-7921 (RJS)(JCF), 2012 WL 4513352, at *13-15 (S.D.N.Y. Sept. 30, 2012) (granting plaintiffs' motions for summary judgment on their false arrest claims related to hundreds of people mass arrested at 2004 RNC in connection with a War Resisters League march and denying defendants' cross-motion on false arrest claims);

f. Despite (then-Mayor) Michael Bloomberg's recognition that, "the majority of the [OWS] protesters have been peaceful and responsible,"[18] there were more than ninety civil rights actions filed in the S.D.N.Y. arising from NYPD OWS arrests and related polices, including, but not limited to, the cases listed in *Marisa Holmes v. City of New York, et al.*, 14-cv-5253 (LTS) (S.D.N.Y.) (Dkt. No. 13 ¶ 89) (listing by caption and docket numbers of many OWS-related cases as of March 13, 2015). Some of those cases resulted in judgments and many resulted in substantial settlements prior to trial including *Peat et al v. City of New York, 12-cv-8230 (SAS)(HBP)* that included offers of judgment and attorney fees totaling $598,028, and which complaint had a similar failure to train Monell claim; *Gerskovich v. Iocco,* 15-cv-7280 (S.D.N.Y. Berman, J.) that settled for $256,000 prior to trial, and which complaint had a similar failure to train Monell claim that had been sustained through Defense Rule 12 and Rule 56 motions; *Packard et al v. City of New York*, 15-cv-7130 (SDNY(AT)(SDA) that settled for a total payout including attorney fees of $980,000, and which complaint had a similar failure to train Monell claim that had been sustained through Defense Rule 12 and Rule 56 motions; and *Case v. City of New York,* 14-cv-9148 (S.D.N.Y.) (AT) that settled for $325,000 prior to trial, and which complaint had failure to train claims similar to those at issue here.

g. The Union Square litigations related to the mass arrests that occurred in and around Union Square Park on September 24, 2011, alleged similar NYPD misconduct that is alleged in this pleading, including, unnecessary and excessive force used on protesters and overall efforts of the NYPD to deter and demoralize protesters. Nearly all of these cases include multiple plaintiffs and were all settled by the City of New York, including *Clarke v NYC*, 13-cv-(RWS); *Crisp v. NYC,* 12-cv-5482(RWS); *Dedrick v. NYC*, 12-cv-7165(RWS); *Dierken v. NYC*, 12-cv-7462(RWS); *Elliot v. NYC*, 12-cv-992(RWS); and *Hanlin v. NYC*, 12-cv-5844(RWS);

h. Those OWS-related cases referenced herein, *Gerskovich, Packard, Case, Peat,* the Union Square Litigations, as well as several other OWS-related cases, included failure to train *Monell* claims concerning protest activity that are similar to the *Monell* claims in this litigation;

---

[18] Michael Bloomberg, *Michael Bloomberg's Statement on the Zuccotti Park Clearance*, The Guardian (Nov. 15, 2011, 8:39 EST), http://www.guardian.co.uk/world/2011/nov/15/michael-bloomberg-statement-zuccotti-park.

23

i. The incidents discussed in the 2003 NYCLU special report created by the NYCLU in the wake of the February 15, 2003 antiwar demonstration, titled *Arresting Protest*, published April 2003, *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_arresting_protest.pdf;

j. The incidents discussed in the 2005 NYCLU special report created by the NYCLU in the wake of protests at the RNC, titled *Rights and Wrongs at the RNC*, published in 2005, *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf;

k. The incidents discussed in the research compiled by The Global Justice Clinic at the New York University School of Law and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice at Fordham Law School in their publication titled *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street*, published July 25, 2015, *available at* http://hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf; and

l. *Edrei v. City of New York*, 16-cv-01652 (JMF)(BCM) (challenging NYPD uses of Long Range Acoustic Device ("LRAD") against perceived "group" for crowd control purposes, including *Monell* allegations challenging many of the same policies and practices herein, *see, e.g.,* First Amended Complaint at Paragraph 415).

## THE NYPD'S POLICY AND/OR PRACTICE OF USING EXCESSIVE FORCE TO CONTROL THE SPEECH OF MEMBERS OF THE PUBLIC

134. Defendants used types and levels of force that were excessive and unnecessary force against Plaintiff.

135. The uses of force against Plaintiff were in contravention of, or inconsistent with, related, written NYPD policies and/or training.

136. However, that use of force was consistent with and ratified within the unwritten policies of the NYPD.

137. In "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices," an October 1, 2015 report published by the New York City Department of Investigation Office of the Inspector General for the NYPD ("OIG- NYPD")10, the

OIG-NYPD made several conclusions critical of the NYPD's then-extant use of force policies, including, *inter alia*, that:

    a.  NYPD's current use of force policy is vague and imprecise, providing little guidance to individual officers on what actions constitute force;

    b.  NYPD's current procedures for documenting and reporting force incidents are fragmented across numerous forms, and officers frequently use generic language that fails to capture the specifics of an encounter;

    c.  NYPD's patrol guide does not properly instruct officers to de-escalate encounters with the public;

    d.  NYPD training does not adequately focus on de-escalation; and

    e.  In the period reviewed, NYPD frequently failed to impose discipline even when provided with evidence of excessive force. OIG-NYPD Report at pp. 3-5.

138.    After October 1, 2015, the NYPD revised its Patrol Guide provisions, and designed, created, and implemented training, to include "updated definitions concerning force, new policies regarding de-escalation, responsibilities of witness officers in use of force incidents, reporting obligations concerning force incidents, and data analysis on use of force incidents." See OIG-NYPD Report at p. 2 et seq.; see also NYPD Patrol Guide Section 221-0111 ("Force Guidelines") and 221-0212 ("Use of Force"), issued and effective June 27, 2016 (implementing changes to NYPD use of force policies in the form of revised written guidelines, incorporated into the NYPD's Patrol Guide).

139.    Upon information and belief, Defendants failed to document, and/or require that fellow Defendants and/or other fellow NYPD members document and failed to investigate and/or

25

supervise fellow NYPD members regarding, uses of force in accordance with related NYPD policies and/or training.

140.    Defendants used force that they knew, or should have known, would negatively impact Plaintiff and/or cause lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate determinations about whether these uses of force were necessary, justified, or reasonable under these circumstances.

## THE NYPD'S FAILURE TO TRAIN REGARDING PROTEST POLICING

141.    Since at least the 1990s, the NYPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, despite being on notice of serious constitutional deficiencies in their existing training.

142.    In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

143.    In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

144.    Upon information and belief, to this day, that document forms the core of the NYPD protest response-related training.

145.    The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to *deter, disperse, and demoralize* groups, including by staging overwhelming presence and force at protest activity, as well as making early and "pro-active" arrests, and mass arrests, using disorder control formations, encirclement or kettling, and other, similar tactics.

146.    Upon information and belief, the core NYPD training, based on the Disorder Control Guidelines, focuses on the use of such tactics to – using the trainings' terminology – "disperse and demoralize" protesters.

147.    These disperse and demoralize tactics and trainings have persisted through the present.

148.    Upon information and belief, the Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

149.    However, neither the Disorder Control Guidelines, nor, upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

150.    On information and belief, there was, and is, virtually no NYPD training—and certainly no *meaningful* NYPD training—focusing on how to utilize the tactics described in the Disorder Control Guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

151.    Defendants' failures to train, which led to violations of Plaintiff's rights in this case, include, *inter alia*, the following:

      a.  The failure to train, instruct, and discipline officers to discourage and prevent misconduct and assault by NYPD members;

      b.  The failure to make clear the need to provide constitutionally meaningful dispersal orders and opportunities to disperse or other, similar fair warning prior

to using force or taking other enforcement action, including, for example, the manner in which to inform demonstrators they must move or disperse, how many warnings to give before taking enforcement action, the length of time to be given in order to provide a meaningful opportunity to comply, and the like;

c. The failure to provide training on the use of reasonable and proportionate force in connecting with policing First Amendment assemblies;

d. The failure to provide training on the need for, or tactics regarding, escort and facilitation of First Amendment activities, and instead training focused almost exclusively on tactics designed to "disperse and demoralize" protesters; and

e. The failure to ensure police response to protests and other protected activities are not based on the content thereof.

152. Although many of the above problems with the NYPD's training are endemic and cut across all of the relevant NYPD training, at present, Defendant City has a policy and practice of deploying one particularly problematic, inadequately trained, poorly supervised and undisciplined group of NYPD members: the NYPD's Strategic Response Group ("SRG").

153. The SRG was created in 2015 as a specialized unit tasked with responding to disorder- causing events and to conduct counter-terrorism operations.

154. The SRG has a unit in each of the five boroughs and the DCU has now been incorporated into the SRG.

155. In response to the public's skepticism that the SRG would be used to crack down on protests, then-Chief of Department James O'Neill stated: "They will not be involved in handling protests and demonstrations. They'll have no role in protests. Their response is single fold. They'll be doing counter-terror work. They'll be assigned to different posts throughout the city."

28

156. However, since 2015, the SRG has been regularly deployed at protests, including those in 2020 related to the George Floyd protests, and in other protests around the city, such as the ones described herein.

157. Many SRG members, including those deployed to the protest in this case, have histories of engaging in the kinds of misconduct complained of herein, documented among other places, by CCRB complaints, and in numerous lawsuits.

158. SRG members are meant to have additional DCU training.

159. Upon information and belief, that additional DCU training is principally modelled on the core principles and tactics in the Disorder Control Guidelines.

160. However, the City of New York has admitted that many of the officers deployed to respond to protests did not even receive that training, which was supposedly required of them.

161. As a result, as noted in the OCC Report, "for a majority of the officers who were assigned to the George Floyd protests, their training on policing protest was limited to what they had received as recruits in the Academy.

162. Between at least 2004 and the present, the NYPD's mass arrest and violent crowd control and protest policing tactics have been on full display in the streets of New York City; the subjects of unfavorable coverage in the media, including coverage explicitly showing video evidence of NYPD members engaging in uses of excessive force in connection with disperse and demoralize while policing protests; documented in complaints to the Civilian Complaint Review Board and other agencies; as well as the litigations discussed above, which have cost the city tens of millions of dollars in judgments and settlements.

163. Indeed, in connection with the 2002 World Economic Forum and the 2004 RNC policing operations, NYPD supervisors - including DCU supervisors charged with designing and

29

implementing NYPD protest policing-related policies and related training – routinely created "after action reports" that documented and critiqued NYPD plans for and responses to protest activities.

164.    For example, in a March 17, 2006 *New York Times* article that was published while discovery about related policies and practices was ongoing in the 2004 RNC litigations, "Police Memos Say Arrest Tactics Calmed Protest," Jim Dwyer reported on the revelation of 2002 WEF after-action reports in then-ongoing litigation, *Allen v. City of New York*, 03-cv-2829 (KMW) (GWG) (SDNY).[19]

165.    Those reports praised employing militarized tactics to reach the goal of disperse and demoralize, such as the "staging of massive amounts" of officers in riot gear including riot helmets and militarized "equipment" such as armored vehicles, prisoner wagons, and buses in view of demonstrations in order to "cause them to be alarmed" and as a "deterrent" as well as the use of "proactive" arrests, like the Plaintiff's arrests here, in order to have a "powerful psychological effect" on protesters.

166.    After the 2002 WEF after-action reports were disclosed in *Allen* and the 2004 RNC-related after-action reports were disclosed in the RNC litigations, and some of them were made public as a result, upon information and belief, rather than continuing to create such reports frankly documenting and assessing the NYPD's protest policing-related policies and tactics, the NYPD opted to stop creating such records.

167.    For example, according to the Corporation Counsel's report, NYPD records do not show any protest-related after action reviews undertaken between the 2004 Republican National Convention until the events of the George Floyd protests.

---

[19] Jim Dwyer, "Police Memos Say Arrest Tactics Calmed Protest," N.Y. Times, March 17, 2006, available at https://www.nytimes.com/2006/03/17/nyregion/police-memos-say-arrest-tactics-calmed-protest.html.

168. Nevertheless, upon information and belief, at all times relevant herein, City policymakers routinely received reports regarding arrests made in connection with First Amendment assemblies. These internal reports include Unusual Occurrence Reports; Mass Arrest Reports including data tracking arrestees, the length of time it took them to go through the system, whether they were released with a summons or DAT, their proposed arrest charges, and other information related to the status and/or dispositions of the cases; internal critiques from supervisors and other officers involved in mass arrests related to police actions taken in relation to an event; and/or other reports including information arrests, use of force protest arrest processing, and/or related prosecutions.

169. Despite the wealth of evidence of NYPD members' historic brutality against protesters, Defendant City has ignored, and/or failed to utilize relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in NYPD training as it relates to constitutionally compliant protest policing.

170. For example, in a deposition in *Packard v. City of New York,* 15-cv-7130 (S.D.N.Y.) (AT), a FRCP 30(b)(6) witness testifying as the City of New York testified that in regard to protest police training it did not review (i) decline to prosecute decisions, (ii) conviction conversion rates or (iii) allegations and settlements in lawsuits relating to protest.

171. As another example, Defendant City apparently does not take allegations in lawsuits filed by protesters claiming they were falsely arrested during protests into account in considering its protest policing-related policies and training, in effect taking the position that there is nothing to be learned from lawsuits and settlements.

172. For example, in a 2017 FRCP 30(b)(6) deposition on (i) sidewalk policy protesting, (ii) dispersal orders, and (iii) training on probable cause standards for protest arrests, Defendant

31

City of New York could not identify any impact that litigation against Defendant City between 2000 and 2011 had on Defendant City's relevant policies, practices, customs, or NYPD training related to protest policing.

173. Relatedly, according to the Corporation Counsel, "the NYPD does not demonstrate a consistent commitment to reviewing and responding to external critiques regarding the policing of protests."[20]

174. At bottom, the NYPD's near-exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests—despite having received clear notice that NYPD policing of protests has caused the systemic violations of protesters' constitutional rights for years— demonstrates both a history and a policy of disregard for the First Amendment, Fourth Amendment, Fifth Amendment, Fourteenth Amendment, and other, related rights of Plaintiff and other similarly injured protesters.

**THE NYPD'S POLICY AND/OR PRACTICE OF USING EXCESSIVE FORCE TO CONTROL THE SPEECH OF PROTESTORS**

175. Defendants used types and levels of force that were excessive and unnecessary force against Plaintiff.

176. The use of force against Plaintiff were in contravention of, or inconsistent with, related, written NYPD policies and/or training.

177. Defendants used force that they knew, or should have known, would negatively impact Plaintiff, and/or cause lasting pain, suffering, and/or injury, without making individualized

---

[20] Margaret Garnett, Commissioner, New York City Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18 .2020.pdf; New York City Law Department, *Corporation Counsel Report Pursuant to Executive Order 58 (June 20, 2020) Directing an Analysis of Factors Impacting the George Floyd Protests in New York City* (Dec. 2020) ("OCC Report"), at 2, 30. https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.

or otherwise appropriate determinations about whether these uses of force were necessary, justified, or reasonable under these circumstances.

## FIRST CLAIM FOR RELIEF

### Unlawful Seizure / False Arrest

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Mr. Hallinan's Rights Under the Fourth and Fourteenth Amendments to the United States Constitution Regarding the May 25, 2023, January 26, 2024, and February 22, 2024 Incidents*

178.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

179.    Defendants' seizures of Plaintiff herein were done without any judicial warrant authorizing them to seize Plaintiff, were unreasonable, and were done without privilege or lawful justification.

180.    Plaintiff did not consent and was conscious of his confinement by Defendants.

181.    Defendants did not have individualized probable cause to seize, detain, or arrest Plaintiff.

182.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

183.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SECOND CLAIM FOR RELIEF

### Excessive Force

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Mr. Hallinan's Rights Under the Fourth and Fourteenth Amendments to the United States Constitution Regarding All Five Incidents*

33

184.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

185.    Defendants' uses of force against Plaintiff were unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

186.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

187.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## THIRD CLAIM FOR RELIEF

### First Amendment

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Mr. Hallinan's Rights Under the First and Fourteenth Amendments to the United States Constitution Regarding All Five Incidents***

188.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

189.    Defendants imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment right, including, but not limited to, in falsely arresting Plaintiff, in subjecting Plaintiff to excessive force, in selectively enforcing laws and regulations against Plaintiff, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

190.    In addition to being retaliatory, the restrictions Plaintiff complains of herein, which Defendants imposed on Plaintiff's First Amendment right to participate in, observe, and/or stand

nearby, speech, conduct, association, and/or other expressive activities protected by the First Amendment on the streets, were themselves regulations on Plaintiff's protected conduct that:

a. Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or, alternately,

b. Were content-neutral, but lacked narrow tailoring to serve a significant governmental interest, in that they burdened substantially more protected speech and/or conduct than necessary to serve those interests, and/or failed to provide ample alternatives for Plaintiff's protected expression, including in that Plaintiff's abilities to communicate effectively were threatened; and/or

c. Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiff's abilities to engage in protected conduct (also raising constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

d. Amounted to the imposition of strict liability on Plaintiff for engaging in protected speech and/or expression.

191. As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

192. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FOURTH CLAIM FOR RELIEF

### First Amendment Retaliation

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Mr. Hallinan's Rights Under the First and Fourteenth Amendments to the United States Constitution Regarding All Five Incidents*

193. Defendants retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment.

194. Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiff's protected speech and/or conduct.

195. Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

196. Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct and associations in the future.

197. Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiff to violations of his First Amendment right.

198. Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiff's First Amendment-based claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

199. Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiff's First Amendment retaliation claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—in response to the perceived viewpoint and/or message expressed by Plaintiff.

200. Additionally, some of the offenses charged against Plaintiff, which Defendants might argue provided probable cause for Plaintiff's arrest, were offenses that Defendants typically exercise their discretion not to enforce, or not to make arrests in connection with.

201.    Plaintiff suffered actual chill, including in that Plaintiff was prevented and/or deterred from or impeded in participating in protected conduct on the date of and after each incident; and/or suffered adverse effects on their protected speech and/or conduct; and/or otherwise suffered some concrete harm(s).

202.    Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in arresting and detaining Plaintiff subjected Plaintiff to the violations of his First Amendment right described elsewhere herein.

203.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

204.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

205.    In particular, Defendant Nikas's dislike for protesters is well documented.   He has often been named as a defendant in lawsuits by protesters, but even more obvious is his attempt to chill protesters rights. As an example, two days after Nicolle Besuden was arrested at a George Floyd protest, Nikas approached her in the street asking her "How was the beach?"  Her attorney, Tahanie Aboushi explained that the NYPD were tracking Ms. Besuden's movements in retribution for her continued participation in protest, and this statement by Nikas was because, "He intended to intimidate her, to harass her, to let her know she is being watched."[21]  Ms. Besuden's lawsuit settled for $150,000, 21-cv-08452.

---

[21] https://patch.com/new-york/new-york-city/nypd-used-instagram-stalk-blm-protester-lawsuit-says

206.    A CCRB complaint against Nikas for abusing his authority while policing protests was sustained and published publicly as part of a large CCRB report concerning misconduct during the summer 2020 protests.[22]  This was not the first substantiated claim by the CCRB against Nikas.

207.    Defendant Nikas was sued for assaulting a photographer documenting a protest and jabbing him in the eye.  That suit was settled for $200,000, *Hassab El Nabi, Abdelrahman v. City of New York*, 23-cv-03768.

208.    Defendant Nikas was also sued by the undersigned counsel for his role in ordering other NYPD members to arrest Mr. Hallinan's co-plaintiff in *Hallinan, et al. v. City Of New York, et al.,* 24-cv-01653, after which Mr. Hallinan was violently arrested while attempting to photograph his co-plaintiff's arrest. In *Hallinan, et al.,* Mr. Hallinan was documenting a peaceful demonstration outside of a family planning clinic, advocating for patients to have access to reproductive care. That suit was settled for $110,000,

209.    Upon information and belief, on June 1, 2020, Nikas was part of a team of police officers that knocked a peaceful protester Oscar Rios to the ground near Port Authority, forced Mr. Rios to lie prostrate on the ground, struck him multiple times with a baton, stepped on and broke his glasses, all while ignoring his complaints of being unable to breath.  Mr. Rios was a class action representative in *Sow v. City of NY,* 21-cv-533, and helped obtain what has been hailed as the largest class action protest settlement in U.S. history.

210.    As discussed elsewhere herein, Defendant City, through officials such as Defendant Nikas, designed and/or implemented policies and practices pursuant to which members of the NYPD, including Defendant Nikas and others, ordered, effected, and otherwise participated in

---

[22] https://www.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/issue_based/Protest%20Data%20Snapshot%20June%20 2021.pdf

arresting and/or detaining and/or prosecuting Plaintiff, thereby subjecting Plaintiff to the above-described violations of Plaintiff's First Amendment rights.

## FIFTH CLAIM FOR RELIEF

### Due Process

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Mr. Hallinan's Rights Protected Under the Fifth and Fourteenth Amendments to the United States Constitution Regarding All Five Incidents***

211.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

212.    As described above, Defendants enforced offenses in a manner that rendered them constitutionally void for vagueness and/or overbroad, such that their enforcement against Plaintiff violated his Due Process rights, in that Defendants' enforcement in connection with those offenses failed to provide and/or reflected the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on ad hoc determinations, often without fair warning.

213.    Additionally, as discussed elsewhere herein, Defendant City, including by its officials designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in seizing and/or retaining Plaintiff's property and/or detaining Plaintiff in the conditions as described subjected Plaintiff to the violations of his Due Process rights described elsewhere herein.

214.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

215.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SIXTH CLAIM FOR RELIEF

### Deprivation of Fair Trial Rights

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Mr. Hallinan's Rights Protected Under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution Regarding the August 27, 2023 Incident*

216.    Plaintiff incorporates by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

217.    Defendants fabricated evidence of a material nature, likely to influence a jury's decision, intentionally forwarded that evidence to prosecutors, as a result of which Mr. Hallinan suffered liberty deprivations and other injuries.

218.    Defendant Lombardi knowingly and intentionally transmitted false information to the New York County District Attorney by providing information to Defendant Peng, who signed a criminal court complaint, as alleged above, falsely stating that Defendant Lombardi observed Plaintiff engage in assault and attempted assault.

219.    These statements were untrue, were communicated to a prosecutor, and were likely to influence the decision of any jury weighing the evidence presented in a prosecution of Plaintiff.

220.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

221.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SEVENTH CLAIM FOR RELIEF

**Malicious Prosecution**

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Mr. Hallinan's Rights Protected Under the Fourth and Fourteenth Amendments to the United States Constitution Regarding the August 27, 2023 Incident*

222. Plaintiff incorporates by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

223. Upon information and belief, Defendants misrepresented and falsified evidence to the prosecutor and/or failed to make a full statement of the relevant evidence – including potentially exculpatory evidence - to the prosecutor.

224. Defendants were directly and actively involved in the initiation or prosecution of criminal proceedings against Plaintiff, including by supplying and creating false information to be included in criminal court paperwork that was included in criminal court paperwork, providing falsely sworn information in accusatory instruments, and/or providing false information to the prosecutor.

225. Defendants lacked probable cause to initiate and continue criminal proceedings against Plaintiff.

226. Defendants acted with malice in initiating criminal proceedings against Plaintiff.

227. Notwithstanding Defendants' misconduct, the criminal proceedings against Plaintiff were favorably terminated as alleged above in the facts sections of this complaint.

228. As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

229. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

41

## EIGHTH CLAIM FOR RELIEF

*Pursuant to 42 U.S.C. 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978) for Defendants' Violations of Plaintiff's Rights Under the First, Fourth, and Fourteenth Amendments to the United States Constitution Regarding All Five Incidents*

230.    Plaintiff hereby incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

231.    The facts pleaded above describe the policies, practices, and customs Defendants subjected Plaintiff to, including, but not limited to: disperse and demoralize tactics, uses of excessive force, unlawful detention, and unreasonable restrictions on photographers' and protesters' First Amendment-protected conduct, often without fair warning; viewpoint discrimination; violation of equal rights; using overtight metal cuffs for protest-related arrests, failing to loosen or remove over-tight cuffs; and, exposing them to searches, property seizures, and unhealthy and conditions of confinement, in lieu of brief street detentions.

232.    As set out above, Defendants arrested Plaintiff entirely without probable cause on numerous occasions.

233.    All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules, and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking officials; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute de facto policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City, through its policymaking officials; (d) Defendant City's deliberate indifference to Plaintiff's rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD officers, despite full knowledge of the officers' wrongful acts, as described herein.

42

**NINTH CLAIM FOR RELIEF**

**Deprivation of Rights**

*Violation of New York City Administrative Code § 8-802 Regarding All Five Incidents*

234.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

235.    The acts of Defendant Officers constituted conduct under color of the laws of the State of New York, under color of the laws, rules, and regulations of the City of New York, and under color of the customs and usages of the City of New York and of the New York City Police Department.

236.    The acts of Defendant Officers caused Plaintiff to be deprived of his rights, as they are granted and guaranteed to him by N.Y.C. Admin. Code §§ 8 – 802, to be secure in his person against unreasonable search and seizure regarding the incidents on May 25, 2023, January 26, 2024, and February 22, 2024.

237.    The acts of Defendant Officers caused Plaintiff to be deprived of his rights, as they are granted and guaranteed to him by N.Y.C. Admin. Code §§ 8 – 802, to be secure in his person against the use of excessive force in connection with Defendants' search and seizure of Plaintiff regarding all five incidents.

238.    The Defendant Officers, while in uniform, unlawfully seized, searched and arrested Plaintiff in violation of N.Y.C. Admin. Code §§ 8 – 802.

239.    As a result of the foregoing, Plaintiff was deprived of his  liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was incarcerated and forced to incur legal expenses and costs to defend

43

themselves and obtain their liberty, was caused to feel unwell during the arrest processing and suffered embarrassment and pain and suffering during and due to his arrests.

240.    As a result of the above conduct, the City of New York is liable, under New York City Administrative Code § 8-803(b) and under the doctrine of respondeat superior, for the conduct of the individual Defendants, and for any damages the individual Defendants caused by and through their conduct.

## TENTH CLAIM FOR RELIEF

### Failure to Intervene

*Violation of New York City Administrative Code § 8-803 Regarding All Five Incidents*

241.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

242.    The acts of all Defendant Officers constituted conduct under color of the laws of the State of New York, under color of the laws, rules, and regulations of the City of New York, and under color of the customs and usages of the City of New York and of the New York City Police Department.

243.    The failure of Defendant Officers to intervene, in violation of N.Y.C. Admin. Code § 8 – 803, caused Plaintiff to be deprived of his rights, as they are granted and guaranteed to him by N.Y.C. Admin. Code § 8 – 802, to be secure in his person against unreasonable search and seizure regarding the incidents on May 25, 2023, January 26, 2024, February 22, 2024, and March 23, 2024.

244.    The failure of Defendant Officers to intervene caused Plaintiff to be deprived of his rights, as they are granted and guaranteed to them by N.Y.C. Admin. Code §§ 8 – 802, to be secure

44

in their person against the use of excessive force in connection with Defendants' searches and seizures of Plaintiff regarding all five incidents.

245.    The failure of the Defendant Officers to intervene while other Defendant Officers unlawfully seized, searched and arrested Plaintiff, caused Plaintiff to be deprived of the right to be secure against such illegal acts as it is granted and guaranteed to them by N.Y.C. Admin. Code §§ 8 – 802.

246.    As a result of the foregoing, Plaintiff was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was incarcerated and forced to incur legal expenses and costs to defend themselves and obtain their liberty, was caused to feel unwell during the arrest processing and suffered embarrassment and pain and suffering during and due to his arrests.

247.    As a result of the above conduct, the City of New York is liable, under New York City Administrative Code § 8-803(b) and under the doctrine of *respondeat superior*, for the conduct of the individual Defendants, and for any damages the individual Defendants caused by and through their conduct.

## ELEVENTH CLAIM FOR RELIEF

### Right to Record

*Violations of New York Civil Rights Law § 79-P Regarding the May 25, 2023, January 26, 2024, and February 22, 2024 Incidents*

248.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

249.    Prior to his assault, battery, and arrest, Plaintiff was exercising his rights under New York Civil Rights Law § 79-P, the New Yorker's Right to Monitor Act, to record law enforcement activity.

250.    In arresting Plaintiff, the Defendant Officers exceeded their authority because their conduct was inconsistent with New York Civil Rights Law § 79-P and the Federal Constitutional.

251.    All Defendants violated New York Civil Rights Law § 79-P in that Plaintiff was arrested while he "exercised or attempted to exercise the right established in subdivision two of this section to record a law enforcement activity and an officer acted to interfere with that person's recording of a law enforcement activity" in one of the specified ways.

252.    Defendants unlawfully arrested Plaintiff to deter him from exercising his right to record law enforcement activity.

253.    New York Civil Rights Law § 79-P creates a private right of action that explicitly provides for punitive damages and injunctive relief, as well as mandatory attorneys' fees and expert fees.

254.    New York Civil Rights Law § 79-P defines "record" and the related right in extremely broad terms.

255.    Specifically, the law creates a right of action to sue for any law enforcement interference with the right, including "attempting to prevent [a] person from recording law enforcement activity." New York Civil Rights Law § 79-P(3)(i); *see also, id* § (iv).

256.    Similarly, there is a cause of action where an officer — regardless of the fact of recording — engages in "commanding that the person cease recording law enforcement activity when the person was nevertheless authorized under law to record, as happened here. New York Civil Rights Law § 79-P(3)(iii).

257.    Thus, the statute creates a right of action, and that right — like the similar First Amendment right — "does not depend on whether [a plaintiff's] attempt to videotape was

frustrated" (*Gericke v. Begin*, 753 F.3d 1, 3 n.2 (1st Cir. 2014)), or for that matter, only intended to create the *impression* someone was recording.

258.    Defendants' actions and policies alike violate New York Civil Rights Law § 79-P such that all the remedies available thereunder are appropriate.

## TWELFTH CLAIM FOR RELIEF

### Right to Record Police Activities

*Violations of New York City Administrative Code § 14-189 Regarding the May 25, 2023, January 26, 2024, and February 22, 2024 Incidents*

259.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

260.    Prior to the assault, battery, and arrest, Plaintiff was exercising his rights under New York Civil City Administrative Code § 14-189, the Right to Record Police Activities.

261.    In arresting Plaintiff, all Defendant Officers exceeded their authority because their actions were inconsistent with New York Civil City Administrative Code § 14-189.

262.    All Defendants violated New York Civil City Administrative Code § 14-189 in that Plaintiff was arrested while he "recorded or attempted to record police activities in accordance with subdivision b and an officer interfered with such person's recording of police activities" in one of the specified ways.

263.    Defendants unlawfully arrested Plaintiff to deter him from exercising his right to record law enforcement activity.

264.    New York Civil City Administrative Code § 14-189 creates a private right of action that explicitly provides for punitive damages and injunctive relief, as well as attorneys' fees and expert fees.

265. New York Civil City Administrative Code § 14-189 defines "record" and the related right in extremely broad terms.

266. Specifically, the law creates a right of action to sue for any law enforcement interference with the right, including "interfer[ing] with such person's recording of police activities." New York Civil City Administrative Code § 14-189(c)(1).

267. Similarly, there is a cause of action where an officer — regardless of the fact of recording — engages in "stopping, seizing, searching, issuing any summons, or arresting any individual because such individual recorded police activities," as happened here. New York Civil City Administrative Code § 14-189(c)(1)(a-c).

268. Thus, the code creates a right of action.

269. Defendants' actions and policies alike violate New York Civil City Administrative Code § 14-189 such that all the remedies available thereunder are appropriate.

## DEMAND FOR A JURY TRIAL

270. Plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

## DEMAND FOR JUDGMENT

271. WHEREFORE, Plaintiff demands judgment against the individual Defendants and the City of New York as follows:

    a. Actual and punitive damages against the individual Defendants in an amount to be determined at trial;

    b. Actual damages in an amount to be determined at trial against the City of New York, and punitive damages to be determined at trial pursuant to N.Y.C. Admin. C. § 8-805(1)(ii);

    c. Injunctive and declaratory relief, including under the New York City Administrative Code;

48

d.  Statutory attorney's fees, disbursements, and costs of the action pursuant to, *inter alia,* 42 U.S.C. § 1988 and N.Y.C. Admin. L. § 8-805(2);

e.  Expert costs and fees pursuant to N.Y.C. Admin. C. § 14-189(c)(4); and

f.  Such other relief as the Court deems just and proper.

Dated:  Ridgewood, New York
        May 26, 2026

**GIDEON ORION OLIVER**

277 Broadway, Suite 1501
New York, NY  10007
t: 718-783-3682
f: 646-349-2914
Gideon@GideonLaw.com

**WYLIE STECKLOW PLLC**

Wylie M. Stecklow
Carnegie Hall Tower
152 W. 57th Street, 8th Floor
New York, NY 10019
t: (212) 566 8000
ECF@WylieLAW.com

**COHEN&GREEN P.L.L.C.**

By:

Elena L. Cohen
J. Remy Green
Regina Yu
Leena Widdi
1639 Centre Street, Suite 216
Ridgewood (Queens), NY 11385
    t: (929) 888-9480
    f: (929) 888-9457
    e: elena@femmelaw.com
       remy@femmelaw.com
       regina@femmelaw.com
       leena@femmelaw.com

*Attorneys for Plaintiff*